**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ______________________

BRANDON WOOLLEY, an individual,

Plaintiff,

v.

GAIA, INC., a Colorado Corporation,
GAIA, INTERNATIONAL, INC., a Colorado
Corporation, IGNITON, INC., a Colorado
Corporation, EDWARD PRESTON, an individual,
KIERSTEN MEDVEDICH, an individual,
JIRKA RYSAVY, an individual, and ROBERT
CHAVEZ, an individual,

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Brandon Woolley, by and through his undersigned counsel, submits this Complaint and Jury Demand against his former employer, Defendant Gaia International, Inc. ("Gaia International"), Gaia International's parent company, Defendant Gaia, Inc. ("Gaia") and Gaia Inc.'s subsidiary, Defendant Igniton, Inc. ("Igniton"), along with Gaia Inc.'s Chief Financial Officer, Defendant Edward (Ned) Preston, Chief Executive Officer, Defendant Kiersten Medvedich, Executive Chairman, Defendant Jirka Rysavy, and janitorial contractor Defendant Robert Chavez, for their violations of federal and state law, and in support thereof alleges the following:

## INTRODUCTION

1. This is a case about a publicly traded company with a prior Securities Exchange Commission (SEC) enforcement history for fraud and whistleblower retaliation, the facilities manager who reported new safety, construction, accounting, internal-control, vendor-payment, and shareholder-fraud concerns, and the retaliation he suffered for doing so.

2. Mr. Woolley was hired by Gaia International as its Facilities Manager.

3. During his employment, Mr. Woolley discovered serious billing, accounting, and internal-control irregularities involving Gaia's janitorial vendor, C&R Cleaning Services, owned and operated by Robert Chavez. The only contract Mr. Woolley could locate authorized $1,500 per month in janitorial charges and was between C&R Cleaning Services and a subsidiary, Boulder Road LLC, yet C&R Cleaning Services was billing Gaia and related entities substantially more than that amount each month.

4. Mr. Woolley reported that C&R Cleaning Services was submitting unsupported and excessive invoices, that Gaia lacked complete accounting records for C&R Cleaning Services despite maintaining detailed records for other vendors, and that Gaia was approving payments that were not matched or cross-checked against contracted services or authorized amounts. He reasonably believed these practices reflected inadequate internal accounting controls, inaccurate books and records, improper vendor payments, and potential fraud.

5. Shortly after Mr. Woolley raised his concerns, Gaia terminated Mr. Woolley's employment on July 21, 2025.

6. Mr. Woolley also raised workplace health and safety concerns regarding Gaia and Igniton's proposed cleanroom and laboratory expansion. Gaia and Igniton sought to construct a cleanroom and expand Igniton's laboratory without obtaining required building and fire permits, using licensed professionals, or complying with applicable building and fire-code requirements.

7. Mr. Woolley refused to participate in unpermitted cleanroom and laboratory construction because he reasonably believed the work was unlawful and dangerous. He repeatedly reported that Gaia could not lawfully plan, commence, or complete the cleanroom and laboratory expansion without required permits, licensed professionals, and compliance with applicable safety, building-code, and fire-code requirements.

8. After Mr. Woolley objected to the cleanroom project proceeding without permits, Gaia executives excluded him from cleanroom discussions, marginalized his role in facilities compliance, and continued to disregard his safety concerns. Mr. Woolley alleges that Gaia retaliated against him for raising these good-faith workplace health and safety concerns.

9. Following their termination of Mr. Woolley and his report of concerns to Gaia's Board of Directors, Defendants then escalated the retaliation through police reports and civil protection order proceedings.

10. On instructions from Gaia's Chief Financial Officer, Defendant Ned Preston, Robert Chavez filed a police report against Mr. Woolley.

11. Additionally, Preston, Chavez, and Chief Executive Officer, Kiersten Medvedich pursued temporary protection orders against Mr. Woolley, but those requests did not result in permanent protection orders.

12. Chavez later filed a second protection order request after Mr. Woolley filed administrative whistleblower complaints with OSHA and DLSS. The court denied the request, vacated the temporary order, and found that Mr. Woolley's administrative complaint could not support a civil protection order.

13. The police reports and protective orders made and sought by these individuals were all because of Mr. Woolley's protected reporting before and after his termination, in an effort to intimidate and discredit him.

14. Mr. Woolley brings this action against Defendants for violating the anti-retaliation protections of the Sarbanes-Oxley Act, Colorado's Protected Health/Safety Expression and Whistleblowing law, Colorado Public Policy and engaging in abuse of process, malicious prosecution, and tortious interference with contract.

15. Mr. Woolley seeks all relief available under law and equity, including back pay, front pay or reinstatement, compensatory damages, general and special damages, punitive damages, exemplary damages, attorney fees, costs, interest, and all other relief necessary to redress the injuries caused by Defendants' unlawful conduct.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

17. The Court may exercise personal jurisdiction over Defendants because Mr. Woolley's claims arise out of Defendants' contacts with Colorado and Defendants conducted business in and employed Mr. Woolley in Colorado.

18. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mr. Woolley's claims occurred in this judicial district.

19. Mr. Woolley timely exhausted his administrative remedies under 18 U.S.C. § 1514A by filing a complaint with the Occupational Safety and Health Administration of the U.S. Department of Labor on January 13, 2026, alleging retaliation in violation of the Sarbanes-Oxley Act. More than 180 days have elapsed since Mr. Woolley filed his OSHA complaint and the Secretary of Labor has not issued a final decision. Mr. Woolley therefore may bring this action in federal court under 18 U.S.C. § 1514A(b).

20. Mr. Woolley has exhausted his administrative remedies under C.R.S. § 8-14.4-105 and timely brings this action under C.R.S. § 8-14.4-106. He received a Notice of Right to Sue from the Colorado Department of Labor and Employment, Division of Labor Standards and Statistics on September 17, 2026.

## PARTIES

21. From August 27, 2024 through March 24, 2025 Gaia International classified Mr. Woolley Brandon Woolley as an independent contractor.

22. On March 24, 2025, Mr. Woolley was promoted to a full-time position and was employed by Gaia International as a Facilities Manager until his termination on July 21, 2025.

23. Mr. Woolley's employment with Gaia International was located at the Gaia headquarters in Louisville, Colorado.

24. Defendant Gaia, Inc. is a corporation incorporated in Colorado and headquartered in Louisville, Colorado.

25. Gaia, Inc. is a member-supported video streaming service that offers videos concerning wellness, spirituality and alternative perspectives on history, science, and current events.

26. Gaia, Inc. is publicly held, and its stock is traded on NASDAQ. As such, it has a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and is subject to 18 U.S.C. § 1514A.

27. At all times relevant, Gaia, Inc. maintained an office in Louisville, Colorado, at 833 W. South Boulder Rd., Bldg. G, Louisville, CO 80027.

28. Defendant Gaia International, Inc. (Gaia International) is a corporation incorporated in Colorado with headquarters in Louisville, Colorado.

29. Gaia International is a wholly owned subsidiary of Gaia, Inc. As a subsidiary of a publicly traded company, Gaia International is covered by 18 U.S.C. § 1514A because its financial information was included in Gaia, Inc.'s consolidated financial statements.

30. At all times relevant, Gaia International maintained an office in Louisville, Colorado at 833 W. South Boulder Rd., Bldg. G, Louisville, CO 80027.

31. Defendant Igniton, Inc. (Igniton) is a corporation incorporated in Colorado and headquartered in Louisville, Colorado.

32. Igniton develops and sells wellness supplements.

33. Gaia owns a controlling 71% ownership interest in Igniton and is the parent company of Igniton.

34. As a subsidiary or controlled affiliate of a publicly traded company, Igniton is covered by 18 U.S.C. § 1514A because its financial information was included in Gaia, Inc.'s consolidated financial statements.

35. At all times relevant, Igniton maintained an office in Louisville, Colorado at 833 W. South Boulder Rd., Bldg. G, Louisville, CO 80027.

36. Defendant Edward Preston is the Chief Financial Officer for Gaia. Preston was Mr. Woolley's direct supervisor at the time of Mr. Woolley's termination.

37. On information and belief, Preston resides in Massachusetts at 4 Stonefield Circle, Winchester, MA 01890 and commutes weekly to Colorado.

38. Defendant Kiersten Medvedich is the Chief Executive Officer for Gaia.

39. On information and belief, Medvedich resides in Colorado at 3223 3rd Street, Boulder, CO 80304.

40. Defendant Jirka Rysavy is the Executive Chairman of Gaia.

41. On information and belief, Rysavy resides in Colorado at 4545 Flagstaff Road, Boulder, CO 80302

42. Defendant Robert Chavez owns and operates C&R Cleaning Services, LLC (C&R Cleaning), which provided janitorial services to Gaia.

43. On information and belief, Chavez resides in Colorado at 2209 Buttercup Street, Erie, CO 80516.

## COMPLAINT ALLEGATIONS

### *Gaia's History of Fraud, and Reporting Violations, Whistleblower Retaliation and Resulting SEC Cease and Desist Order*

44. In 2023 the Securities and Exchange Commission (SEC) settled claims against Gaia for fraudulent representations about the number of paying subscribers of its video streaming service. The SEC also found that Gaia unlawfully retaliated against a whistleblower who reported the issue internally and to the SEC. Finally, the SEC

45. Specifically, the SEC found as follows:

> Gaia also violated the anti-retaliation provisions of Section 21F(h) of the Exchange Act when it retaliated against a whistleblower who reported the subscriber count issue both internally to Gaia management and separately to the Commission (the "Whistleblower"). The Whistleblower reported potential wrongdoing internally to Gaia management on at least two occasions. When Gaia did not fully investigate or remediate the issue, in March 2020, the employee filed a complaint with the

> Commission and, over the next few months, continued to complain internally to Gaia managers about a range of issues. Gaia fired the Whistleblower in July 2020, stating, in writing, that Gaia terminated the Whistleblower "for cause" for making "unfounded complaints that required a significant expenditure of company resources to fully investigate." Those complaints included the whistleblower's complaints about the overstatement of paying subscribers.

*In the Matter of Gaia, Inc. and Paul C. Tarell, Jr., CPA*, Order Instituting Cease-and-Desist Proceedings, May 13, 2023, *available at* https://www.sec.gov/files/litigation/admin/2023/33-11196.pdf.

46. On information and belief, Defendants Medvedich and Rysavy were involved in the decision to terminate and actual termination of this whistleblower.

47. To resolve the SEC charges, Gaia agreed to a $2 million civil penalty.

48. Gaia also agreed to cease and desist from committing or causing any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

***Mr. Woolley's Employment with Gaia***

49. On or about August 27, 2024, Gaia International hired Mr. Woolley as an independent contractor to provide facilities management services.

50. The Independent Contractor Agreement between Mr. Woolley and Gaia International was signed by Pavel Bouska, Facility Manager and Chief Operating Officer of Igniton.

51. On February 14, 2025, in recognition of Mr. Woolley's successful performance as an independent contractor, and because Bouska had retired, Gaia

International offered him the full-time position of Facilities Manager with a start date of March 24, 2025.

52. The offer of employment submitted to Mr. Woolley was signed by Defendant Edward Preston, the Chief Financial Officer of Gaia and the direct supervisor of the full-time Facilities Manager position.

53. As both an independent contractor and full-time employee, Mr. Woolley took his responsibilities as Facilities Manager very seriously. He worked hard to guarantee that the Gaia facilities were safe. He worked with local government officials and the police and fire departments to highlight Gaia's presence in the community and advocate for assistance in keeping the facilities safe.

54. Additionally, Mr. Woolley worked hard to confirm that the facilities were operating in compliance with federal, state and local laws, regulations and building codes.

***Mr. Woolley Refuses to Participate in Unpermitted Cleanroom and Laboratory Construction***

55. Early in Mr. Woolley's initial contractor period, Bouska informed Mr. Woolley that Defendant Jirka Rysavy preferred to complete improvements and construction at Gaia's facilities without permits due to Rysavy's dislike of government intrusion.

56. On information and belief, Gaia had, prior to Mr. Woolley's employment, performed several renovations to its Louisville facility without appropriate permitting and that was not code compliant.

57. Later, when Mr. Woolley reached out to an external architect for help with a project, the architect told him the same thing regarding Rysavy preferring to complete construction on Gaia property without permits.

58. During Mr. Woolley's employment, Gaia planned to undergo capital improvements to its facilities in Louisville including constructing a manufacturing room with zero humidity, free from static and outside contamination, often referred to as a "cleanroom."

59. Igniton required such a cleanroom for the safe manufacturing of its supplement products.

60. Gaia also wanted to expand the Igniton laboratory.

61. Mr. Woolley was asked multiple times by different executives to perform these capital improvements quickly and without building and fire permits required by local and state law.

62. On April 22, 2025, Mr. Woolley met with Rysavy, Gaia Executive VP and Igniton Chief Financial Officer Jennifer Seay, Igniton Lab Manager Valaria Snowden, Igniton Chemist Pramod Dhunghna, Owner of Climate Engineering Todd Flannery and Stulz USA Representative Justin Peltzer.

63. During the meeting Rysavy asked Mr. Woolley if the cleanroom and laboratory expansion construction project could be done quickly and without permits.

64. In response, Mr. Woolley told him that permits were necessary and the project could not move forward without them.

65. Mr. Woolley reasonably believed that Gaia's desire to construct cleanrooms and expand Igniton's laboratory without obtaining the appropriate permits was a violation of government health and safety rules.

66. Specifically, construction without proper permitting violated applicable City of Louisville building-code and fire-code permitting requirements, including adopted provisions requiring permits before covered construction work.

67. Because Mr. Woolley refused to participate in the cleanroom construction project without permits required by law, Gaia executives, including Rysavy and Seay, began to treat Mr. Woolley differently.

68. Prior to the April 22, 2025 meeting Rysavy regularly spoke with Mr. Woolley and would frequently ask Woolley's advice on projects. After the meeting Rysavy completely stopped speaking to or engaging with Mr. Woolley while Mr. Woolley was at work.

69. Similarly, Seay stopped consulting Mr. Woolley regarding facilities projects or issues and would act annoyed toward Mr. Woolley when he went to her.

70. Between April 22, 2025 and July 7, 2025, Woolley was systematically excluded from further discussions and meetings regarding the cleanroom construction project despite his position as Facilities Manager.

71. On May 21, 2025, at the direction of Rysavy, Defendant Medvedich ordered Human Resources (HR) Manager Margaret Woolley[1] to relocate Mr. Woolley's desk away from the C-suite executives.

72. Mr. Woolley was moved from a quiet space near Rysavy and the other executives to an office that had previously been converted into a server and storage room.

73. Being relocated away from the C-suite executives undermined his position and affected how his colleagues viewed Mr. Woolley's role with Gaia.

74. On July 7, 2025, in a meeting with Ashley Grace, Chief Marketing Officer for Igniton, and Seay, Mr. Woolley was again asked to plan, commence and complete the cleanroom and lab expansion construction project without permits. Mr. Woolley refused.

75. When asked why he refused, Mr. Woolley explained that it was against the law and dangerous. Mr. Woolley also offered to bring in two architects, an engineer, and a licensed contractor to explain further.

76. On July 9, 2025, Mr. Woolley introduced an architect and general contractor to Grace. Seay was also invited to the meeting but declined to attend.

77. On July 12, 2025, Mr. Woolley sent an email to Grace, Seay, and Preston outlining the permitting process required to build a proper manufacturing space for

[1] Margaret Woolley is Brandon Woolley's spouse.

Igniton's encapsulation facility. He closed the email by saying: "I know this may seem time consuming and costly but it's the right thing to do for so many reasons."

***Mr. Woolley Reports Unsafe Supplement Manufacturing***

78. In addition to Woolley's objections to unpermitted cleanroom and laboratory construction, Woolley also reported workplace-safety concerns regarding Igniton's supplement manufacturing operations.

79. Because Igniton was behind schedule, it began manufacturing supplements before completion of its cleanroom.

80. The room Igniton used to manufacture supplements lacked appropriate humidity controls, which caused the machines to malfunction. To address the malfunctioning machines, employees opened the machine doors and stirred the ingredients with their hands as part of the supplement-production process.

81. Mr. Woolley reasonably believed the manual-stirring practice was dangerous and could result in serious injury because the machine was turned on while the employees were stirring ingredients.

82. Mr. Woolley reasonably believed Igniton was violating OSHA regulations and that the manual stirring of ingredients while inside the machine likely implicated 29 C.F.R. § 1910.212 and other OSHA regulations.

83. In April and May 2025, Mr. Woolley reported this dangerous supplement-manufacturing practice several times to Preston and Seay, but Gaia and Igniton did not correct the dangerous conduct.

***Mr. Woolley Uncovers and Reports Inadequate Internal Financial Controls Regarding Vendor C&R Cleaning Services***

84. In spring 2025, Mr. Woolley was also uncovering and reporting irregularities concerning Gaia's janitorial vendor, C&R Cleaning Services, owned and operated by Defendant Robert Chavez.

85. Throughout Mr. Woolley's employment with Gaia, Mr. Woolley became increasingly concerned about Chavez's conduct and influence.

86. Chavez frequently bragged to Mr. Woolley that he had outsized influence with Gaia executives, including Defendants Preston and Medvedich, because he regularly gave them gifts. These gifts included golf packages, food services, customized golf equipment, golf attire, and fresh fish flown in from Seattle.

87. Mr. Woolley also observed Chavez violate safety directions and engage in unsafe conduct.

88. For example, on June 17, 2025, Mr. Woolley learned that Chavez climbed onto the roof of the Gaia International building during an electrical storm and slipped and fell near a skylight.

89. Chavez going on the roof during an electrical storm, was the last in a series of unsafe incidents that Mr. Woolley had observed.

90. On the same day, June 17, 2025, Mr. Woolley met with Chavez and Preston separately to inform them that because of Mr. Woolley's concerns regarding Chavez's safety violations, Mr. Woolley was going to investigate C&R Cleaning Services' contract with Gaia.

91. Mr. Woolley also expressed his concern that for several months, C&R Cleaning Services had been reducing its services without reducing its invoices.

92. As a result of the incidents on June 17th, Mr. Woolley began searching for the contract between Gaia and C&R Cleaning Services.

93. Mr. Woolley first asked for the contract from Christine Williams who worked in Gaia's Account Payable department, but she was unable to provide him with the contract between Gaia and C&R Cleaning Services.

94. Mr. Woolley eventually found the contract after extensively searching through Gaia's files. It was in former CFO Paul Tarrell's sub-folder within the Boulder Road LLC folders on Gaia's computer drive.

95. It was then that Mr. Woolley learned that Gaia International's only contract with C&R Cleaning Services was an eight-year-old contract between C&R Cleaning Services and Gaia's wholly owned subsidiary Boulder Road LLC.

96. That contract allowed monthly billing of only $1,500 for janitorial services.

97. During Mr. Woolley's employment, C&R Cleaning Services regularly billed Gaia more than $15,000 per month for "Janitorial night service, all common areas throughout 833 W. South Boulder Rd."

98. C&R Cleaning Services also regularly billed Boulder Road LLC more than $4,000 per month for "Monthly maintenance fee for duties outside of custodial work at 833 W. South Boulder Rd."

99. C&R Cleaning Services also regularly billed Igniton more than $600 per month for "Janitorial night service 833 W. South Boulder Rd."

100. C&R Cleaning Services did not have a contract with Gaia or Igniton.

101. Mr. Woolley discovered that C&R Cleaning Services was billing Gaia approximately $200,000 to $250,000 per year, and that Gaia was paying those invoices, even though Gaia did not have a contract with C&R Cleaning Services that would permit such payments.

102. Mr. Woolley reasonably believed that Chavez was fraudulently billing Gaia.

103. He further reasonably believed that Gaia lacked adequate internal controls to manage its vendor contract with C&R Cleaning Service.

104. Mr. Woolley reasonably believed that because of Chavez's fraudulent billing of Gaia and Gaia's inadequate internal controls, Gaia was paying C&R approximately $20,000 per month without a contract.

105. From June 18 – June 25, Mr. Woolley raised his concerns regarding C&R Cleaning Services' billing practices multiple times to Preston, and Williams.

106. On June 18, 2025, Mr. Woolley, Preston, and Chavez met to discuss the incidents of the previous day.

107. At this meeting, Mr. Woolley explained what he had learned regarding the contract between C&R Cleaning Services and Gaia.

108. Specifically, Mr. Woolley informed Chavez and Preston that C&R Cleaning Services had only one contract, that the contract was with Gaia's wholly owned subsidiary Boulder Road LLC, and that it authorized only $1,500 per month in exchange for janitorial services.

109. Mr. Woolley highlighted that C&R Cleaning Services was submitting monthly invoices for approximately $20,000 per month, including invoices to Gaia and Igniton, which had no contract with C&R Cleaning Services.

110. Mr. Woolley requested that Preston correct the billing, contract, internal-controls, and accounting issues, or, in the alternative, remove C&R Cleaning Services as Gaia's janitorial vendor.

111. During the June 18, 2025 meeting, Preston and Chavez agreed that Chavez would present new and specific contracts for review and consideration.

112. Chavez failed to present the requested contracts.

113. On or around June 25, 2025, Mr. Woolley, Preston, and Chavez met again; neither Preston nor Chavez acknowledged that Chavez had failed to present new contracts.

114. At the June 25th meeting, Mr. Woolley again raised his concerns regarding C&R Cleaning Services billing and contract irregularities.

115. On or around July 15, 2025, C&R Cleaning Services submitted new invoices that continued to seek payment for more than provided for in its contract.

116. Mr. Woolley denied payment of the July 15, 2025 invoices in Gaia's accounting software program, Yooz, and referred the invoices to Preston for further review and investigation.

117. Mr. Woolley denied payment because he reasonably believed that paying the invoices would violate Gaia's internal financial controls, result in misrepresented financials, and facilitate what he reasonably believed was C&R Cleaning Services' and Chavez's ongoing fraud.

118. The same day, Preston approved payment of C&R Cleaning Services' invoices.

119. Preston also requested that Williams forward all future C&R Cleaning Services invoices directly to him and exclude Mr. Woolley.

120. Mr. Woolley raised concerns regarding Gaia's ongoing inadequate internal financial controls, namely, Gaia's receipt, approval and payment of C&R Cleaning Services' unsupported, unsubstantiated, improper, and excessive billing to Williams and Preston.

121. Gaia refused to take appropriate action regarding C&R Cleaning Services' billing practices or the internal financial-control violations those practices created.

122. Mr. Woolley continually raised his billing concerns to Preston because he reasonably believed Gaia was approving payments to C&R Cleaning Services for

amounts greater than allowed under the only contract Mr. Woolley could locate and without detailed invoices identifying the services provided.

123. Mr. Woolley reasonably believed Gaia, lacked appropriate controls to manage the budget for the services provided by C&R Cleaning Servies and ensure that the services were executed in accordance with management's authorization.

124. Mr. Woolley reasonably believed that Gaia was failing to monitor its expenditures to C&R Cleaning Services and conform to generally accepted accounting principles.

***Gaia Terminates Mr. Woolley for His Protected Reports and Mr. Woolley Files Whistleblower Reports***

125. By July 2025, Mr. Woolley had become a direct obstacle to Gaia's preferred practices concerning both facilities compliance and lax internal controls. He had refused to perform unpermitted and dangerous construction work, reported supplement-manufacturing and fire-code safety concerns, challenged Chavez's influence over Gaia executives, challenged C&R Cleaning Services' unsupported invoices, and refused to approve invoices he reasonably believed were improper.

126. On the morning of July 21, 2025, six days after Mr. Woolley refused to approve C&R Cleaning's unsupported invoices, Mr. Woolley was summoned to Preston's office and terminated.

127. On information and belief, Defendant Rysavy directed the termination.

128. On July 23, 2025, Mr. Woolley filed a whistleblower complaint with Gaia's Board Audit Committee.

129. Mr. Woolley reported that C&R Cleaning Services was engaged in excessive, unsupported and improper billing.

130. Mr. Woolley also reported that Gaia C-Suite executives failed to enforce compliance with gift giving from vendors leading to corruption and breach of fiduciary duty.

131. On July 23, 2025, Mr. Woolley also filed a Tip, Complaint or Referral (TCR) Form with the SEC regarding his concerns about Gaia's conduct and compliance.

***Gaia and Its Agents Escalate the Retaliation Through Police Reports and Protection Orders***

132. On information and belief, in response to Mr. Woolley's July 23, 2025 Audit Committee report, Gaia's Board of Directors, including Rysavy, instructed Medvedich, Preston, and/or Chavez to file police reports against Mr. Woolley with the Louisville Police Department.

133. On July 24, 2025, one day after Mr. Woolley filed his whistleblower complaint, Chavez filed a police report against Mr. Woolley regarding an alleged incident that had occurred more than thirty days earlier.

134. Preston instructed Chavez to file this police report against Mr. Woolley.

135. Mr. Woolley fully cooperated with the resulting police investigation and no charges were brought.

136. On July 25, 2025, Gaia sent an all-company email alleging that Mr. Woolley was dangerous and directing employees to report any sighting of him on campus.

137. Between July 25 and July 28, 2025, Medvedich, Preston, and Chavez each applied for temporary protective orders against Woolley.

138. Preston and Medvedich's complaints each referenced Mr. Woolley's whistleblower report to the Gaia Board of Directors as one of the acts that led to their request for a protective order.

139. Preston and Chavez were granted temporary protective orders.

140. On information and belief, during Medvedich's hearing, she told the judge that she was there on orders from Gaia's Board of Directors.

141. When asked if she was afraid of Mr. Woolley, Medvedich told the court, "No."

142. The judge therefore denied Medvedich's application for a temporary protective order.

143. On July 29, 2025, Paul Sutherland as representative of the Gaia Board Audit Committee emailed Mr. Woolley confirming that an internal investigation had been initiated in response to his whistleblower report.

144. Neither Preston nor Chavez ever served Mr. Woolley with the temporary protective orders they had received.

145. On August 8, 2025, Preston failed to appear at the permanent protection order hearing.

146. On the same day, at the hearing for Chavez's permanent protective order, Chavez's request for a protective order was dismissed.

***Chavez Files a Second Complaint for a Temporary Protective Order After Mr. Woolley Files an OSHA Whistleblower Complaint***

147. On January 13, 2026, Mr. Woolley filed a Complaint for Retaliation in Violation of the Sarbanes-Oxley Act with the U.S. Department of Labor, Occupational Safety and Health Administration against Gaia, Gaia International, Igniton, Preston, Rysavy, and Medvedich.

148. In his complaint, Mr. Woolley outlined his concerns regarding the relationship between Gaia and C&R Cleaning Services as it related to Gaia's internal controls, accounting, and financial obligations as a publicly traded company.

149. On May 15, 2026, Chavez filed a Verified Complaint for Civil Protection Order seeking a protection order against Mr. Woolley alleging physical assault, threat, or other situation, even though Mr. Woolley and Chavez had no contact since August 8, 2025 the date Chavez's prior protection order was dismissed.

150. The only thing that changed since Chavez dismissed his prior protection order was that Mr. Woolley exercised his federally protected right to file an administrative whistleblower complaint against Gaia and its leadership.

151. On May 29, 2026, the Boulder County Court held a hearing on Chavez's second request for a permanent protection order against Mr. Woolley.

152. During the hearing, Chavez admitted that the only event that occurred after he voluntarily dismissed his first protection order request was that Mr. Woolley filed an administrative complaint in which Chavez's name appeared.

153. Chavez admitted that Mr. Woolley's filing his OSHA whistleblower administrative complaint under 18 U.S.C. 1514A was the sole basis for the new protection order.

154. Chavez also admitted that Mr. Woolley had not threatened him, had not come to his workplace, had not come to his home, had not brandished a weapon at him, and that Chavez had not seen Mr. Woolley since July 2025.

155. The Boulder County Court dismissed Chavez's second protective order, holding that there was no basis for a civil protection order.

## CLAIMS FOR RELIEF

### First Claim
### Retaliation in Violation of the Sarbanes-Oxley Act
### 18 U.S.C. § 1514A – Against Gaia, Gaia International, Preston, Medvedich, and Rysavy

156. Mr. Woolley restates and incorporates all preceding paragraphs as though fully set forth herein.

157. At all times relevant, Gaia, Inc. was an employer covered by 18 U.S.C. § 1514A.

158. At all times relevant, Gaia, Inc. had a class of securities registered under section 12 of the Securities Exchange Act of 1934 or was required to file reports under section 15(d) of the Securities Exchange Act of 1934.

159. At all times relevant, Gaia International and Igniton were covered as subsidiaries or affiliates whose financial information was included in Gaia, Inc.'s consolidated financial statements, and Preston, Medvedich, and Rysavy were covered as officers of Gaia, Inc.

160. At all times relevant Mr. Woolley was an employee of Gaia, Inc or Gaia International.

161. Mr. Woolley provided information to persons at Gaia with supervisory authority over him and persons employed by Gaia who had the authority to investigate, discover or terminate misconduct.

162. Mr. Woolley reasonably believed that the information that he provided to such persons involved conduct that would constitute a violation of section 1341, 1343, 1344, 1348 or any rule or regulation of the Securities and Exchange Commission or any provision of Federal Law relating to fraud against shareholders.

163. Specifically, and without limitation, Mr. Woolley reasonably believed Gaia violated or was involved in the violation of the following statues: (1) 18 U.S.C. § 1341; (2) 18 U.S.C. § 1343; (3) 18 U.S.C. § 1344; and (4) 15 U.S.C.A. §78m(b)(2).

164. Gaia, itself or through its officers, employees, contractors, subcontractors, or agents discriminated against Plaintiff in the terms and conditions of his employment by terminating his employment in retaliation against him for raising complaints or otherwise engaging in protected conduct under the Sarbanes-Oxley Act.

165. As a direct and proximate result of the retaliation of Gaia, Gaia International, Preston, Medvedich, and Rysavy, Mr. Woolley has suffered, and will continue to suffer, substantial economic and non-economic damages.

166. Mr. Woolley seeks all relief necessary to make him whole, including all relief available under 18 U.S.C. § 1514A.

**<u>Second Claim</u>**
**Retaliation in Violation of Colorado's Protected Health/Safety Expression and Whistleblowing Law ("PHEW") C.R.S. § 8-14.4-101 et seq. Against Gaia, Gaia International, Igniton and Preston, Medvedich, and Rysavy**

167. Mr. Woolley restates and incorporates all preceding paragraphs as though fully set forth herein.

168. At all times relevant, Mr. Woolley was a worker as defined in C.R.S. § 8-14.4-101(5).

169. At all times relevant, Gaia, Inc., Gaia International, Inc., Igniton, Inc. were "principals" under C.R.S. § 8-14.4-101(3) because they were employers, entities contracting with workers in Colorado, and/or entities controlling the workplace conditions giving rise to Mr. Woolley's health and safety concerns.

170. Defendants Preston, Medvedich, and Rysavy were also "principals" under PHEW because they acted directly and indirectly in the interest of Gaia, Gaia International, and Igniton in relation to Mr. Woolley.

171. Preston, Medvedich, and Rysavy each had operational control over, or substantial involvement in, the workplace conditions, employment decisions, and retaliatory actions at issue.

172. Mr. Woolley engaged in protected activity under PHEW when he raised reasonable, good faith concerns about workplace violations of government health or safety rules and significant workplace threats to employee health and safety.

173. Gaia, Gaia International, Igniton, Preston, Medvedich and Rysavy knew about Mr. Woolley's protected PHEW activity because Mr. Woolley raised his concerns directly to Gaia supervisors, executives, managers, agents, or other workers.

174. Gaia, Gaia International, Igniton, Preston, Medvedich and Rysavy retaliated against Mr. Woolley for his protected PHEW activity by moving his work location, excluding him from facilities and cleanroom discussions, ignoring or marginalizing his safety and code-compliance concerns, terminating his employment, and engaging in post-termination conduct intended to punish, intimidate, and discredit him.

175. Mr. Woolley's protected PHEW activity was a cause of, and contributed to Gaia's, Gaia International's, Igniton's, Preston's, Medvedich's, and Rysavy's retaliatory conduct.

176. As a direct and proximate result of the above outlined retaliation, Mr. Woolley has suffered, and will continue to suffer, economic and non-economic damages.

177. Pursuant to C.R.S. § 8-14.4-101, et seq., Mr. Woolley is entitled to all available remedies, including but not limited to reinstatement, back pay, front pay, compensatory damages, punitive damages, reasonable attorney fees and costs, and any other relief the Court deems just and proper.

**Third Claim**
**Wrongful Discharge in Violation of Public Policy – Against Gaia and Gaia International**

178. Mr. Woolley restates and incorporates all preceding paragraphs as though fully set forth herein.

179. The State of Colorado recognizes a clear public policy protecting employees who refuse to perform unlawful work, refuse to participate in conduct that threatens workplace health or safety, and raise good-faith concerns about workplace conditions that violate government health or safety rules.

180. The State of Colorado also recognizes a clear public policy protecting employees who raise concerns about fraud in the workplace.

181. Gaia and Gaia International terminated Mr. Woolley because of, and in retaliation for, his refusal to follow Gaia's and Gaia International's directives to engage in unlawful or dangerous construction work, and the directives to not report his concerns regarding workplace safety, code compliance, machine guarding, and health-and-safety violations.

182. Gaia and Gaia International also terminated Mr. Woolley because of, and in retaliation for, his refusal to follow Gaia's and Gaia International's directive

to engage in fraudulent conduct with regard to Gaia's and Gaia's International contractor C&R Cleaning Services, and its directive not to report fraudulent conduct on the part of Gaia and Gaia International and their contractor C&R Cleaning Services.

183. Mr. Woolley's retaliatory termination frustrates Colorado public policy by discouraging employees from refusing unlawful work and from reporting workplace conditions that threaten employee health and safety and fraud in the workplace.

184. Gaia's conduct was willful and wanton and attended by circumstances of malice and reckless disregard for Mr. Woolley's rights.

185. As a direct and proximate result of Gaia's and Gaia International's wrongful discharge of Mr. Woolley in violation of public policy, Mr. Woolley has suffered, and will continue to suffer, significant economic and non-economic injuries, damages, special damages, and losses.

**Fourth Claim**
**Abuse of Process – Against Defendants Preston, Medvedich, and Chavez**

186. Mr. Woolley incorporates and adopts by reference all preceding paragraphs as though fully set forth herein.

187. The purpose of obtaining a temporary civil protection order under Colorado law is to prevent assaults and threatened bodily harm, domestic abuse, emotional abuse of the elderly or at-risk adults, sexual violence and stalking. C.R.S. § 13-14-10.4.5.

188. Defendants Preston, Medvedich, and Chavez willfully used the temporary civil protection order proceedings for ulterior objectives unrelated to protection from any actual, imminent, or continuing threat posed by Mr. Woolley.

189. Specifically, Defendants Preston, Medvedich, and Chavez used the civil protection order process to punish and intimidate Mr. Woolley for filing whistleblower complaints, to create leverage against him in connection with his protected administrative and legal claims, to chill his continued pursuit of those claims, and to portray him to Gaia employees, law enforcement, courts, and others as dangerous rather than as a whistleblower who had reported unlawful and unsafe conduct.

190. Defendants Preston, Medvedich, and Chavez used the civil protection order process in an improper manner - they did not seek protection orders because of their fear of Mr. Woolley and they did not seek to prevent the threats outlined in C.R.S. § 13-14-10.4.5.

191. As a direct and proximate result of Defendants Preston's, Medvedich's, and Chavez's abuse of process, Mr. Woolley suffered damages, including attorney fees, costs, lost time, emotional distress, humiliation, reputational harm, and other economic and non-economic losses.

192. Defendants Preston, Medvedich, and Chavez's conduct was attended by circumstances of fraud, malice, or willful and wanton conduct, entitling Mr. Woolley to an award of punitive damages pursuant to C.R.S. § 13-21-102.

## **Fifth Claim**
## **Malicious Prosecution – Against Defendants Preston, Medvedich, and Chavez**

193. Mr. Woolley incorporates and adopts by reference all preceding paragraphs as though fully set forth herein.

194. Defendants Preston, Medvedich, and Chavez initiated an action against Mr. Woolley seeking permanent civil orders of protection.

195. The civil orders of protection actions brought by Defendants Preston, Medvedich, and Chavez ended in favor of Mr. Woolley because Defendants Preston, Medvedich nor Chavez were granted permanent civil orders of protection.

196. Defendants Preston, Medvedich, and Chavez lacked probable cause to obtain permanent civil orders of protection.

197. The civil order of protection actions brought by Defendants Preston, Medvedich and Chavez against Mr. Woolley were maliciously motivated and brought for a reason other than bringing Mr. Woolley to justice.

198. As a direct and proximate result of Defendants Preston's, Medvedich's, and Chavez's malicious prosecution, Mr. Woolley suffered damages, including attorney fees, costs, lost time, emotional distress, humiliation, reputational harm, and other economic and non-economic losses.

199. Defendants Preston, Medvedich, and Chavez's conduct was attended by circumstances of fraud, malice, or willful and wanton conduct, entitling Mr. Woolley to an award of punitive damages pursuant to C.R.S. § 13-21-102.

## Sixth Claim
## Tortious Interference with a Contract Against Defendants Preston and Chavez

200. Mr. Woolley hereby incorporates by reference all preceding paragraphs as though fully incorporated herein.

201. At all times relevant, Mr. Woolley had a valid and subsisting employment relationship with Defendant Gaia International.

202. At all times relevant, Defendants Preston and Chavez knew or should have known of Mr. Woolley's employment relationship with Defendant Gaia International.

203. Defendants Preston and Chavez, by words or conduct, or both, intentionally and improperly caused, induced, or contributed to Gaia International's termination of Mr. Woolley's employment.

204. Defendants Preston and Chavez's interference with Mr. Woolley's employment agreement was motivated by a desire to induce Gaia International to terminate or breach its employment contract with Mr. Woolley, and/or by Defendants Preston's and Chavez's personal animus toward Mr. Woolley.

205. Defendants Preston's and Chavez's interference was wrongful, without justification, and carried out with malice or reckless disregard for Mr. Woolley's employment contract with Defendant Gaia International.

206. As a direct and proximate result of Defendants Preston's and Chavez's tortious conduct, Mr. Woolley has suffered, and continues to suffer, economic and non-

economic damages and injuries, including pain and suffering, inconvenience, emotional distress, humiliation, embarrassment, impairment of quality of life, reputational harm, past and future economic losses, including loss of wages and benefits and loss of earning capacity, and other losses.

## PRAYER FOR RELIEF

Wherefore, Mr. Woolley prays that this Court enter judgment against Defendants for the following:

a. Appropriate equitable relief, including but not limited to declaratory and injunctive relief;

b. Actual economic damages, including back pay and other economic losses, in an amount to be established at trial;

c. Compensatory damages, including but not limited to damages for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d. Punitive, liquidated, and/or exemplary damages in such amounts as are allowed by applicable law;

e. Pre-judgment and post-judgment interest at the highest lawful rate;

f. A tax gross-up or other equitable adjustment to account for increased tax liability resulting from any lump-sum damages award, where permitted by law;

g. Reinstatement to the position and seniority status Mr. Woolley would have held but for Defendants' unlawful conduct, or, if reinstatement is not feasible, front pay;

h. Reclassification of Mr. Woolley's departure as resignation, instead of termination;

i. Compensation for special damages sustained as a result of Defendants' retaliation and unlawful conduct, including reasonable attorney fees where authorized by law;

j. All costs and expenses of this litigation, including expert witness fees, and costs of court, where authorized by statute, contract, rule, or other applicable law; and

k. All other relief to which Mr. Woolley may be entitled and that the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Mr. Woolley demands a trial by jury.

Dated: October 9, 2026

Respectfully submitted,

**OGBORN MIHM, LLP**

*s/Clayton E. Wire*

Clayton E. Wire, Reg. No. 41717
Megan K. O'Byrne, Reg. No. 53327
Ogborn Mihm LLP
1700 Lincoln, St., Ste. 2700
Denver, CO 80203
Phone: 303-592-5900
Fax: 303-592-5910
Email: Clayton.Wire@omtrial.com
Email: Megan.OByrne@omtrial.com

*Attorneys for Mr. Woolley*